## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

CARLOS E. ESPINOZA,                          )
                                             )
                 Plaintiff,              )
                                             )
vs.                                          )     Case No.  15-cv-0639-MJR-SCW
                                             )
DANIEL JUSTICE,                              )
ALFONSO DAVID,                               )
SHERRI LYNN,                                 )
CHRISTINE BROWN,                             )
and DAN VAREL,                               )
                                             )
                 Defendants.             )

## MEMORANDUM AND ORDER

REAGAN, Chief District Judge:

## I.     INTRODUCTION

Representing himself, Carlos Espinoza (Plaintiff), an inmate in the custody of the Illinois Department of Corrections, filed this suit pursuant to 42 U.S.C. § 1983.  Plaintiff alleges that his civil rights were violated when defendants failed to adequately provide treatment for an injury to his right knee.  This matter is before the Court on motions for summary judgment filed by Defendants Justice, Lynn, and Brown (Doc. 145), Defendant Varel (Doc. 138), and Defendant David (Doc. 134).  Those motions are ripe for disposition.  For the reasons described below, summary judgment is appropriate as to Defendants Lynn, Brown, and Varel.

## II.    SUMMARY OF KEY ALLEGATIONS AND EVIDENCE

In June 2009, Plaintiff was incarcerated at Dixon Correctional Center (Dixon).

(Doc. 157-1, p. 2).  On June 1, 2009, Plaintiff suffered an injury to his right knee during an altercation with another inmate.  (*Id.*).  An MRI performed on September 29, 2009 indicates that Plaintiff suffered a rupture of his ACL versus a high-grade sprain.  (Doc. 157-2, p. 3).  While Plaintiff was being escorted to segregation, he informed the escorting officer that he needed medical attention for his knee injury.  (*Id.* at 2).  The officer radioed his supervisor, Defendant Justice, to relay Plaintiff's request.  (*Id.* at 3).  Defendant Justice, however, refused to allow Plaintiff to see a nurse or a doctor for treatment.  (*Id.*).

Plaintiff received medical care the following day, June 2, 2009, though he does not recall the specific time.  (Doc. 146-1, p. 88).  Plaintiff was in pain until he was seen by the nurse and given ibuprofen.  (Doc. 157-1, p. 17).  Plaintiff had no further interaction with Defendant Justice regarding his failure to obtain medical care and/or his knee.  (Doc. 146-1, p. 89).  Plaintiff claims that he filed a grievance against Defendant Justice in September 2009, but did not receive a response.  (Doc. 157-1, p. 15).

Plaintiff was seen by nurses and doctors on numerous dates in June and July of 2009.  (Doc. 113, p. 8).  In September 2009, Plaintiff was sent to the University of Illinois Medical Center where he received an MRI of his right knee.  (Doc. 146-1, p. 18; Doc. 157-1, p. 4).  In October 2009, Plaintiff consulted with an orthopedic specialist, Dr. Chmell.  (Doc. 157-2, p. 5).  It was indicated that Plaintiff would be sent for some physical therapy and that Plaintiff was to follow up in three months.  (*Id.*).

Plaintiff transferred to Shawnee Correctional Center ("Shawnee") in early January 2010. (Doc. 157-1, p. 5). Once at Shawnee, Plaintiff was seen by Defendant Dr. David. Plaintiff saw Dr. David for the first time on January 12, 2010. (Doc. 153, p. 8). Plaintiff informed Dr. David of his ACL injury and of the orthopedist's assessment and plan. (*Id.*). Plaintiff told Dr. David that the orthopedist ordered that Plaintiff be sent for physical therapy and then sent to the orthopedist's office for a follow up. (*Id.*). According to Plaintiff, he was told by the orthopedist that surgery might be necessary. (*Id.* at 9). Plaintiff requested that Dr. David send Plaintiff to an outside clinic for physical therapy. (*Id.*). According to Plaintiff, however, Dr. David stated that Plaintiff would not be sent either for physical therapy or to an outside orthopedic surgeon. (*Id.*). Dr. David recommended that Plaintiff do some exercises in his cell, which Plaintiff claims he was unable to do by himself due to the weakness and instability of his injured knee. (*Id.*). Plaintiff also asked Dr. David to provide a knee sleeve or brace due to the weakness and instability suffered by Plaintiff; however, Dr. David refused. (*Id.*).

According to Dr. David, he reviewed the orthopedist's report. (Doc. 135-2, p. 2). Dr. David acknowledges that the orthopedist recommended physical therapy, but did not recommend surgery. (*Id.*). Dr. David's review of Plaintiff's records indicated to him that Plaintiff underwent physical therapy at Dixon from October 30, 2009 to November 13, 2009, but was then documented as a "no show" discharged on December 14, 2009. (*Id.*). Plaintiff told Dr. David that he was in segregation during the "no show" period. (*Id.*) Dr. David indicates that during his initial examination of Plaintiff, he

found no swelling, tenderness, or deformity of his right knee. (*Id.*). Nor did he find any limitation, and he noted that Plaintiff had good muscle strength, as well as, the ability to walk without assistance. (*Id.*). In Dr. David's opinion, Plaintiff's knee was normal. (*Id.*).

After seeing a nurse practitioner on several occasions, Plaintiff was seen by Dr. David again on March 8, 2010. (Doc. 153, p. 9 – 10). Plaintiff told Dr. David that he needed something for the pain he was experiencing with his knee. (*Id.* at 10). Plaintiff had previously been prescribed naproxen by the nurse practitioner. (*Id.*). Dr. David again determined that Plaintiff's knee was normal; however, Plaintiff points out that the nurse practitioner had previously noted some crepitus, which, according to Dr. David, is a crackling sound that can be heard from a joint in some conditions. (*Id*; Doc. 135-2, p. 2). Dr. David continued Plaintiff's order for naproxen, and again advised him to continue performing range of motion exercises to maintain the normal function of his right knee. (Doc. 135-2, p. 3).

Between March 10, 2010 and March 16, 2010, Plaintiff claims he continued to experience pain, weakness, and instability on his injured knee. (Doc. 153, p. 11). During this time, Plaintiff again saw Dr. David, and informed the doctor that Plaintiff's knee would sometimes give out on him. (*Id.*). Dr. David continued Plaintiff on naproxen and gave Plaintiff a low bunk permit for three months. (*Id.*).

Dr. David next saw Plaintiff on November 9, 2010, after a referral from a visit with the nurse practitioner. (*Id.* at 12). Plaintiff complained of his treatment, and told

Dr. David that he was having occasional pain to his right knee. (*Id.*). Again, Dr. David continued Plaintiff on his naproxen order, advised Plaintiff of his range of motion exercises, and removed Plaintiff's low bunk/low gallery permit. (*Id.*). He advised Plaintiff to be careful going up and down the top bunk. (*Id.* at 13). According to Dr. David, he performed some tests on Plaintiff's knee which came back negative. (Doc. 135-2, p. 4).

On August 11, 2012, Plaintiff reported to nurse sick call and complained that he had slipped and hurt his right knee while in the shower. (Doc. 153, p. 14; Doc. 135-2, p. 5). Dr. David indicates that he noted no swelling, tenderness, crepitus, or limitation of movement. (Doc. 135-2, p. 5). The doctor found the right knee to be normal. (*Id.*). He noted that Plaintiff had degenerative joint disease or arthritis, and advised Plaintiff to rest his right knee and do range of motion exercises as tolerated. (*Id.*).

On November 28, 2012, Plaintiff saw a Dr. Shepard, who was filling-in for Dr. David. (Doc. 153, p. 15). Dr. Shepard performed testing that indicated that Plaintiff may have reinjured his right knee. (*Id.*). Dr. Shepard referred Plaintiff to an orthopedic surgeon for an evaluation. (*Id.*). At a collegial, however, a Dr. Haymes determined that Plaintiff should be sent to an offsite physical therapist rather than an orthopedic surgeon. (*Id.*). Plaintiff saw a physical therapist on December 28, 2012. (Doc. 135-1, p. 76). The therapist found that Plaintiff presented with an old ACL tear and ordered home exercises. (*Id.*).

After meeting with the physical therapist, Plaintiff saw Dr. David again on

March 5, 2013 regarding complaints of occasional pain to his right knee. (Doc. 153, p. 17). Plaintiff informed Dr. David that he had been doing the exercises recommended by the physical therapist. (*Id.*). Dr. David noted that Plaintiff was walking normally, that there was no swelling of the right knee, that Plaintiff had normal range of motion, and that there was no crepitus. (*Id.*). To ensure that the exercises were performed as shown by the physical therapist, Dr. David ordered that Plaintiff be scheduled on the treatment line every other day for 30 minutes for two months to perform his exercises, and that nursing staff should document and chart the exercises to make sure Plaintiff is doing them properly. (*Id.*).

Plaintiff next saw Dr. David on May 7, 2013 for a follow-up after completing his home exercises. (*Id.* at 18 - 19). Plaintiff reported that he was suffering from worse, sharp, knee pain and that his knee was weak, popping, and was giving out on him. (*Id.* at 19). Plaintiff also informed Dr. David that he has to support himself to prevent himself from falling. (*Id.*). Dr. David's physical examination found that Plaintiff's knee was not swollen or tender, but that there was some crepitus when Plaintiff shifted his leg. (*Id.*). Dr. David then ordered an x-ray of Plaintiff's right knee. (*Id.*). The x-ray was performed on May 9, 2013. (*Id.*). The x-ray came back negative. (Doc. 135, p. 7). It did not show a joint effusion, acute displaced fracture, or a dislocation. (*Id.*).

Plaintiff presented to Dr. David again on July 17, 2013, at which time he told Dr. David that his knee had gotten worse. (Doc. 153, p. 20). Plaintiff indicated that his knee was still giving out and made a popping noise when walking. (*Id.*). Dr. David

indicated that he would review Plaintiff's medical records again and possibly represent Plaintiff at a collegial for referral to an orthopedist. (*Id.*). Dr. David then completed a referral for Plaintiff to be seen by an orthopedist on July 22, 2013. (*Id.*). He discussed the referral the next day in collegial; however, the referral was not approved by Dr. Garcia, the Utilization Management Physician. (Doc. 135, p. 8).

At some point while at Shawnee, Plaintiff sent a letter to Defendant Sherri Lynn, the administrator of the healthcare unit at Shawnee regarding his lack of treatment for his knee injury. (Doc. 146-1, p. 91). As Healthcare Unit Administrator, it was Defendant Lynn's responsibility to ensure that the inmates at Shawnee had access to health care services. (Doc. 146-3, p. 1). Defendant Lynn, however, is not a doctor, and does not have the authority to make treatment determinations. (*Id.* at 2). Nor does she have the authority to overrule the treatment decisions of an inmate's doctor. (*Id.* at 2). According to Plaintiff, he complained about Dr. David's refusal to follow the direction of the University of Illinois orthopedist. (Doc. 157-1, p. 5 – 6). Plaintiff also indicates that he filed a grievance regarding his lack of knee treatment on October 31, 2012. (*Id.* at 11). This grievance was referred to Defendant Lynn, who responded by referring Plaintiff to the institutional physician for a follow-up. (*Id.*). Plaintiff later filed a second related grievance on February 25, 2013. (Doc. 146-3, p. 3). Defendant Lynn again responded by referring Plaintiff to Dr. David. (*Id.* at 5). Plaintiff also indicates that, generally, between January 2010 and July 2013, he made multiple requests to Dr. David for treatment, all while reinjuring his knee multiple times. (Doc. 157-1, p. 5).

In March 2014, Plaintiff was transferred to Pinckneyville Correctional Center ("Pinckneyville"). (Doc. 146-1, p. 77). Plaintiff was referred for a physical therapy consult by Dr. Shah. (*Id.* at 79). He as seen by Defendant Daniel Varel, a physical therapist, on May 29, 2014. (Doc. 140-1, p. 79; Doc. 140-5, p. 1). Defendant Varel performed an assessment, and found Plaintiff's range of motion and strength of his knee to be within normal limits. (Doc. 140-5, p. 2). Varel referred Plaintiff back to Dr. Shah, and communicated to Plaintiff that his home exercise program was still appropriate. (*Id.*). He recommended that Plaintiff continue those exercises to maintain his normal range of motion and strength. (*Id.*). It was Defendant Varel's assessment that Plaintiff would not have benefitted from therapy in addition to his exercise plan. (*Id.*). Defendant Varel confirmed his recommendations with a physician. (*Id.*). Plaintiff followed-up with Dr. Shah, who told him that nothing else could be done for him. (Doc. 140-1, p. 81).

Plaintiff also wrote requests to Pinckneyville's Healthcare Unit Administrator, Defendant Christine Brown.

Defendant Brown has the same responsibilities and limitations at Pinckneyville that Defendant Lynn has at Shawnee. (*See* Doc. 146-4, p. 1, 2). On July 30, 2015, Defendant Brown responded to a grievance submitted by Plaintiff on May 31, 2015, and received by the healthcare unit on July 28, 2015, wherein Plaintiff complained of treatment relating to his knee on May 28, 2015. (*Id.* at 8). Defendant Brown indicated that Plaintiff had been seen by a nurse, and that he did not exhibit any swelling or

bruising. (*Id.*). During that visit, he had been instructed to return to nurse sick call if Motrin and exercises did not help. (*Id.*). In this response, Defendant Brown indicated that if Plaintiff's knee was still bothering him, he should submit for nurse sick call to be reevaluated. (*Id.*).

On September 11, 2014, Defendant Brown again responded to a grievance regarding treatment of Plaintiff's knee. (*Id.* at 6). The grievance had been received on September 9, 2014. (*Id.*). Defendant Brown stated that Plaintiff had been discharged by the physical therapist, who noted that Plaintiff would no longer benefit from seeing him. (*Id.*). She mentioned that the therapist noted that Plaintiff's strength and range of motion were normal, and that he was seen by the MD on September 9, 2014. (*Id.*). She informed Plaintiff that if his knee continued to bother him, he would have to submit for nurse sick call to be evaluated. (*Id.*). Plaintiff was later transferred from Pinckneyville to Graham, where he currently resides.

## III.  APPLICABLE LEGAL STANDARDS

### A.  <u>Summary Judgment</u>

Rule 56 of the Federal Rules of Civil Procedure governs summary judgment motions. The rule states that summary judgment is appropriate only if the admissible evidence considered as a whole shows there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. ***Archdiocese of Milwaukee v. Doe*, 743 F.3d 1101, 1105 (7th Cir. 2014) (citing F**ED**. R. C**IV**. P. 56(a))**. The party seeking summary judgment bears the initial burden of demonstrating – based on the pleadings,

affidavits and/or information obtained via discovery – the lack of any genuine issue of material fact. *Celotex Corp. v. Catrett*, **477 U.S. 317, 323 (1986)**. A genuine issue of material fact remains "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, **477 U.S. 242, 248 (1986)**. *Accord Bunn v. Khoury Enterpr. Inc.*, **753 F.3d 676 (7th Cir. 2014)**.

In assessing a summary judgment motion, the district court views the facts in the light most favorable to, and draws all reasonable inferences in favor of, the nonmoving party. *Anderson v. Donahoe*, **699 F.3d 989, 994 (7th Cir. 2012)**; *Righi v. SMC Corp.* , **632 F.3d 404, 408 (7th Cir. 2011)**; *Delapaz v. Richardson*, **634 F.3d 895, 899 (7th Cir. 2011)**. As the Seventh Circuit has explained, as required by Rule 56(a), "we set forth the facts by examining the evidence in the light reasonably most favorable to the non-moving party, giving [him] the benefit of reasonable, favorable inferences and resolving conflicts in the evidence in [his] favor." *Spaine v. Community Contacts, Inc.*, **756 F.3d 542 (7th Cir. 2014)**.

### B. <u>Deliberate Indifference</u>

Prison officials violate the Eighth Amendment's proscription against "cruel and unusual punishments" if they display deliberate indifference to an inmate's serious medical needs. *Greeno v. Daley*, **414 F.3d 645, 652–53 (7th Cir. 2005) (quoting** *Estelle v. Gamble*, **429 U.S. 97, 104 (1976) (internal quotation marks omitted))**. *Accord Rodriguez v. Plymouth Ambulance Serv.*, **577 F.3d 816, 828 (7th Cir. 2009) ("Deliberate indifference to serious medical needs of a prisoner constitutes the unnecessary and**

**wanton infliction of pain forbidden by the Constitution.")**.  A prisoner is entitled to reasonable measures to meet a substantial risk of serious harm — not to demand specific care.  *Holloway v. Delaware Cnty. Sheriff*, **700 F.3d 1063, 1074 (7th Cir. 2012) (stating that a prison doctor "is free to make his own, independent medical determination as to the necessity of certain treatments or medications, so long as the determination is based on the physician's professional judgment and does not go against accepted professional standards");** *Forbes v. Edgar*, **112 F.3d 262, 267 (7th Cir. 1997).**  Although a prison official may not continue a course of treatment he knows is blatantly ineffective, prisoners are not entitled to receive unqualified access to healthcare.  *See Holloway*, **700 F.3d at 1073-74**.  A doctor may provide the care he feels is reasonable so long as it falls within a "range of acceptable courses based on prevailing standards in the field."  *Id.* **at 1073**.

To prevail, a prisoner who brings an Eighth Amendment challenge of constitutionally-deficient medical care must satisfy a two-part test.  *Arnett v. Webster*, **658 F.3d 742, 750 (7th Cir. 2011).**  The first prong is whether the prisoner has shown he has an objectively serious medical need.  *Arnett*, **658 F.3d at 750**.  *Accord Greeno*, **414 F.3d at 653.**  A medical condition need not be life-threatening to be serious; rather, it could be a condition that would result in further significant injury or unnecessary and wanton infliction of pain if not treated.  *Gayton v. McCoy*, **593 F.3d 610, 620 (7th Cir. 2010).**  *Accord Farmer v. Brennan*, **511 U.S. 825, 828 (1994) (violating the** *Eighth Amendment* **requires "deliberate indifference to a** *substantial* **risk of** *serious* **harm.")**

**(internal quotation marks omitted) (emphasis added).** Only if the objective prong is satisfied is it necessary to analyze the second, subjective prong, which focuses on whether a defendant's state of mind was sufficiently culpable. *Greeno*, **414 F.3d at 652-53**.

Prevailing on the subjective prong requires a prisoner to show that a prison official has subjective knowledge of—and then disregards—an excessive risk to inmate health. *Greeno*, **414 F.3d at 653.** The plaintiff need not show the defendant literally ignored his complaint, just that the defendant was aware of the serious medical condition and either knowingly or recklessly disregarded it. *Hayes v. Snyder*, **546 F.3d 516, 524 (7th Cir. 2008).** Deliberate indifference is not negligence; rather it is more akin to intentional wrongdoing. *McGee v. Adams*, **721 F.3d 474, 480 (7th Cir. 2013).** The standard is criminal recklessness, and even gross negligence will not meet this standard. *Id.* **at 481**.

IV. **ANALYSIS**

   A.   <u>Defendant Justice</u>

Defendant Justice is not entitled to summary judgment on the record before the Court. Defendant Justice claims that he is entitled to summary judgment for two reasons: first, because Plaintiff's claims against him are barred under the statute of limitations, and second, because he was not deliberately indifferent as a matter of law. Defendant Justice has failed to meet his burden of demonstrating he is entitled to summary judgment based on either of these claims, however.

First, there exists a genuine dispute of fact that precludes summary judgment on the statute of limitations defense. Claims brought pursuant to § 1983 borrow the statute of limitations from the state in which the alleged violation occurred. *Wilson v. Garcia*, **471 U.S. 261, 276 (1985);** *Ashafa v. City of Chicago*, **146 F.3d 459, 461 (7th Cir. 1998).** Illinois has a two year statute of limitations, which thus becomes the applicable statute of limitations for § 1983 claims arising in Illinois. *Kalimara v. Illinois Dep't of Corrections*, **879 F.2d 276, 277 (7th Cir. 1989).** Plaintiff's claim against Defendant Justice originated in June 2009, but Plaintiff did not file this lawsuit until six years later in June 2015. Therefore, Defendant argues, Plaintiff's claim is barred by the statute of limitations.

Plaintiff, however, raises the issue of tolling—an issue not raised by Defendant Justice. Federal Courts borrow the forum state's principles of tolling. *Smith v. City of Chicago Heights*, **951 F.2d 834, 839-40 (7th Cir. 1992).** Illinois requires tolling by statute where "the commencement of an action is stayed by an injunction, order of the court, or statutory prohibition." **735 ILCS 5/13-216.** The Seventh Circuit has found that federal courts must toll the statute of limitations period while an inmate exhausts his administrative remedies as required by the Prisoner Litigation Reform Act ("PLRA"). *Johnson v. Rivera*, **272 F.3d 519, 522 (7th Cir. 2001)**. Plaintiff alleges that he filed a grievance regarding the June 2, 2009 incident in September 2009. He claims that he never received a response to the grievance, however. Therefore, argues Plaintiff, the statute of limitations has been tolled and his suit was still filed within the limitations

period.

Taken to its logical end, Plaintiff's argument would essentially allow for indefinite tolling anytime a grievance is not responded to, including where a grievance is inadvertently lost by prison staff. While the Court strongly doubts that the statute of limitations can be tolled indefinitely in the case of an unavailable administrative remedies process, Defendant Justice, who did not address the issue of tolling, has not provided the Court with any case on this issue. The Court has not been able to locate a case squarely on point, and the closest case seems to provide some support for Plaintiff's position.

In *Johnson v. Rivera*, an inmate filed a grievance regarding the toilet in his cell malfunctioning on December 22, 1995. **272 F.3d at 520**. The inmate claimed that this grievance was destroyed by a guard, however, and never received a response. ***Id.*** Plaintiff filed suit on June 24, 1998, and the district court dismissed his complaint on statute of limitations grounds, stating that "it became clear well within the limitations period that [the inmate] would not obtain satisfaction via the prison's administrative procedures," and therefore should have filed suit sooner. ***Id.* at 520, 522 (internal quotations omitted).** The Seventh Circuit reversed. It held for the first time that a federal court relying on the Illinois statute of limitations in a § 1983 is required to toll the limitations period during the time a prisoner is completing the administrative remedies process. ***Johnson**, 272 F.3d at 522*. In addition, the Seventh Circuit disagreed with the district court's finding that Plaintiff should have known that it was futile to

wait to receive a response to his grievance and therefore should have filed suit sooner. *Id.* It noted that the district court failed to cite to any authority supporting this notion, and the Seventh Circuit refused to set aside the inmate's assertions of misconduct by a defendant. *Id.* Unfortunately, the court did not address the issue of whether the inmate in that case could toll the limitations period indefinitely.

While this Court doubts that the Seventh Circuit would sanction a rule allowing indefinite tolling when the administrative remedies process is unavailable, given that court's ruling in *Johnson*, and without the benefit of adequate briefing and more developed facts, this Court cannot find anything other than that the statute of limitations as to Plaintiff's claim against Defendant Justice was tolled until Plaintiff filed suit.[1]

Defendant Justice also cannot demonstrate he was not deliberately indifferent to Plaintiff's serious medical need. The Court has no doubt that a ruptured ACL constitutes a serious medical condition. Moreover, sufficiently serious pain can constitute a serious medical condition. *See Gayton***, 593 F.3d at 620**. Plaintiff has indicated that he was in pain, and the question of the severity of such pain is one of fact

---

[1]     This Court believes that the district courts would benefit from a bright line rule governing the length of time an inmate's claim is tolled until the limitations period begins to run in situations where an inmate does not receive a response to a grievance or appeal of a grievance. The Illinois Administrative Code provides that the Illinois Department of Corrections' Administrative Review Board must respond to the appeal of a grievance within six months "when reasonably feasible under the circumstances." **20 ILL.ADM.CODE § 504-850(e)**. Therefore, in this Court's judgment, a reasonable length of time would be one year from the time the grievance or appeal not responded to was filed.

for a jury to decide. In arguing that he was not deliberately indifferent, however, Justice points out that Plaintiff received care within a day after injuring his knee. Nonetheless, viewing the facts in Plaintiff's favor, Justice refused to seek medical care for Plaintiff when it was requested. Such inaction caused a delay in care for Plaintiff, and Plaintiff was in pain until he received treatment. This conscious refusal to seek medical care for Plaintiff, even for a short period of time, amounts to, at least, a wanton infliction of pain by Defendant Justice, which constitutes deliberate indifference. *See Gutierrez v. Peters*, **111 F.3d 1364, 1371 (7th Cir. 1997) (recognizing that "delays in treating painful medical conditions that are not life-threatening can support Eighth Amendment claims")**.

**B.     Defendant Varel**

Upon reviewing the record as it pertains to Defendant Varel, the Court finds that Defendant Varel is entitled to summary judgment. The Court notes that Plaintiff did not file a formal response to Defendant Varel's Motion for Summary Judgment. Therefore, the Court takes the facts set forth by Defendant Varel, which have been included in the Court's factual recitation above, as true. *See* Fed. R. Civ. P. 56(e). These facts indicate that Varel was attentive to Plaintiff's needs and appropriately treated him. Varel was not Plaintiff's regular physician, but was seeing him on a referral. Varel performed an examination of Plaintiff's knee, which came back normal. Therefore, Varel did not recommend additional physical therapy as it would not have done Plaintiff any good, and was not necessary. Varel communicated this fact to Plaintiff.

He also instructed Plaintiff to continue doing his home exercises in his cell in order to keep his current strength. From the Court's view, it is not clear what more Defendant Varel could have done. Defendant Varel did not act with deliberate indifference in his sole visit with Plaintiff. Defendant Varel is therefore entitled to summary judgment.

### C.     Defendants Lynn and Brown

Defendants Lynn and Brown also are entitled to summary judgment. The Court first notes that as to Defendant Lynn, specifically, Plaintiff's generalized claims that he complained about his treatment over a period of three and a half years to Defendant Lynn are too vague and generalized to maintain a claim against her. The Court will only consider the specific allegations against each defendant. From the record before the Court, no juror could reasonably find that Defendants Lynn and Brown acted with deliberate indifference toward Plaintiff. Rather, those two defendants responded to Plaintiff's complaints in a timely manner, and either referred him to the prison physician or instructed him to put-in for nurse sick call if he had further issues.

The thrust of Plaintiff's issues with Lynn and Brown appears to be the fact that they did not see to it that he was seen by an outside specialist. Lynn and Brown are not physicians, however. The defendants indicate that they have no authority to make treatment decisions, much less overrule a physician's treatment decision, and Plaintiff has certainly not provided any real factual evidence suggesting otherwise. The best Plaintiff does is assert that these defendants have the authority to refer inmates to the institutional physician. Referring an inmate to the physician of the facility is part of the

healthcare administrator's job, however. Such a task is much different than referring an inmate to an outside specialist. Merely referring an inmate to the institutional physician does not constitute a treatment decision. Referring an inmate to a specialist does constitute a course of treatment decision, and that decision can only be made by a physician at the institution. The record before the Court indicates that Defendants Lynn and Brown acted appropriately in regards to Plaintiff. Therefore, Lynn and Brown are entitled to summary judgment.

### D. Dr. David

The Court notes that Plaintiff filed a sur-reply (Doc. 158), which Defendant David has moved to strike (Doc. 159). As sur-replies are not permitted in this district pursuant to Local Rule 7.1(g), Defendant David's Motion to Strike is **GRANTED**. Plaintiff's sur-reply is **STRICKEN**, and is not considered by the Court.

Regardless, the Court finds that Dr. David is not entitled to summary judgment. It is clear there exists a factual dispute as to the ongoing nature of Plaintiff's knee injury while under Dr. David's care. According to Dr. David, each of his examinations found Plaintiff's knee to be normal. Plaintiff, however, consistently indicated that his knee was in pain and/or that it was weak/giving out. Of course, to get past summary judgment, the factual dispute must be material, and, here, the Court finds that this dispute is material.

When Plaintiff first presented to Dr. David in January 2010, Dr. David knew that Plaintiff had not completed his full physical therapy regimen due to his time in

segregation at Dixon. The orthopedist's report, which Dr. David reviewed, also indicated that Plaintiff was to return for a follow up in three months, and there is no indication that Plaintiff was ever sent for a follow-up. Though Plaintiff was not in Dr. David's care at that three month mark, Plaintiff saw Dr. David shortly after that point and Plaintiff was not sent for a follow up or prescribe a formal physical therapy regimen. Though evidence that a different medical professional would have chosen a differing course of treatment is not sufficient to prove a constitutional violation, *Petties v. Carter*, 826 F.3d 722, 729 (7th Cir. 2016), evidence indicating that a physician acts in a manner contrary to the recommendation of a specialist can be sufficient to demonstrate deliberate indifference, *Perez v. Fenoglio*, 792 F.3d 768, 777 (7th Cir. 2015) (citing *Arnett*, 658 F.3d at 753)). Dr. David did not follow the orthopedist's direction that Plaintiff be sent for a follow up and nor did he restart Plaintiff's formal physical therapy program. Viewing the facts in the light most favorable to Plaintiff, given the fact that Dr. David knew that Plaintiff had not completed his physical therapy and that he was overdue to return to the orthopedist for a follow up, Dr. David's failure to send him back to the specialist is evidence of deliberate indifference.

Given that Dr. David prescribed home exercises at his initial meeting with Plaintiff, his refusal to restart Plaintiff's formal physical therapy regimen on this single meeting might be written off as an exercise of medical judgment rather than deliberate indifference. The problem for Dr. David, however, is that he stuck to this treatment plan for almost three and a half years without prescribing a formal physical therapy

program or sending Plaintiff to an orthopedic specialist. During this time Plaintiff consistently complained that his knee hurt and/or was weak/giving out on him. Persistence by a physician on a course of treatment that the physician knows is ineffective is evidence of deliberate indifference. *See Greeno*, **414 F.3d at 655**. Here, given Plaintiff's consistent complaints over a three and a half year length of time, and given the orthopedic specialist's initial direction for physical therapy and a follow up, a jury could reasonably find that Dr. David's failure to prescribe physical therapy and/or timely refer Plaintiff to a specialist constituted deliberate indifference.

In addition, Dr. David's eventual acquiescence to refer Plaintiff to an orthopedic specialist in July 2013, does not necessarily absolve him of violative conduct at that point. The fact that the referral was denied at collegial, citing Dr. David's consistent normal findings in his examinations, calls into question whether Dr. David was seriously advocating for a referral. Given the sheer length of time it took Dr. David to issue a referral, and given that Dr. David issued the referral when, as he claims, his examination again indicated a normal knee, a jury could infer that Dr. David's "referral" was simply to appease Plaintiff and/or to cover himself and that he was not seriously advocating for Plaintiff to be referred to an orthopedist.

For the reasons stated above, a jury could find that Dr. David was deliberately indifferent in knowingly continuing an ineffective course of treatment by not ordering formal physical therapy for Plaintiff and/or by not referring Plaintiff to an orthopedic specialist much sooner. As such, summary judgment is not appropriate as to Dr. David.

## V.    CONCLUSION

As discussed above, the motion for summary judgment filed by Defendants Justice, Lynn, and Brown (Doc. 145) is **GRANTED in part and DENIED in part**, the motion for summary judgment filed by Defendant Varel (Doc. 139) is **GRANTED**, and the motion for summary judgment filed by Dr. David (Doc. 134) is **DENIED**. As such, the Court orders the following disposition:

- All claims against Defendants Lynn, Brown, and Varel are **DISMISSED with prejudice**. The Clerk of Court is **DIRECTED** enter judgment for Defendants Lynn, Brown, and Varel and against Plaintiff **at the close of the case**.

- All claims against Defendants Justice and David shall go forward and those defendants remain in the case.

IT IS SO ORDERED.

DATED November 15, 2017.

*s/ Michael J. Reagan*
MICHAEL J. REAGAN
United States District Judge